## THE C. F. BIELMAN. THE WELCOME. MEYER v. SPOKANE S. S. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. February 1, 1923.)

No. 3137.

Collision ⬤⟞72(2)—Tug and tow held at fault in collision with vessel at dock in river.

Both steam tug and tow, bound up the Milwaukee river when the tow collided with a vessel at a dock, the tow being permitted to sheer to the right four points, *held* at fault.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

Libel in rem by the Chicago & South Haven Steamship Company against the steamer C. F. Bielman, the Spokane Steamship Company, claimant, and the steam tug Welcome. From a decree holding the steamer and tug both liable, Sophie Meyer, owner of the tug, appeals. Affirmed.

F. L. Leckie, of Cleveland, Ohio, and Harney B. Stover, of Milwaukee, Wis., for appellant.

Charles E. Kremer, of Chicago, Ill., for appellees.

Before BAKER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. The Chicago & South Haven Steamship Company, appellee, owner of the steamboat Petoskey, filed a libel in rem against the steamer C. F. Bielman and steam tug Welcome in the District Court for the Eastern District of Wisconsin. Trial was had before Judge Geiger and a jury, the latter finding that collision with the Petoskey was solely the fault of the steamer Bielman. On motion, the court set aside the advisory verdict of the jury and held both the Bielman and the Welcome liable. An appeal to this court by the Bielman has been dismissed. Sophie Meyer, owner of the Welcome, also appealed, and this case is to be decided upon her appeal.

In the afternoon of May 9, 1920, a clear bright day, the tug Welcome, in the outer harbor at Milwaukee, took in tow the steam freighter Bielman, 291 feet long. The tow line was furnished by the Bielman. The Bielman, loaded with 3,000 tons of coal, was bound up the Milwaukee river for its unloading point beyond the Broadway bridge. The general course of the river was towards the northwest. It was about 360 feet wide at the Northwestern bridge and 300 feet half way to the Broadway bridge, which was 1,000 feet from the Northwestern, and there the river was 270 feet wide. The angle between the down river side of the Broadway bridge and the dock line of the river, on the southwesterly side, was about 120°, and because the river was narrow and the bridge had side piers and lifted up in the middle boats had to pass through it on a right-angle line.

For the facts, we take the testimony of the captain of the tug, as the most favorable to appellant. The Bielman sheered to the right at a point below the Northwestern bridge, and again while going through

that bridge. Both times the tug straightened it up. After passing the bridge, it was necessary for the Bielman, then moving three or four miles per hour, to turn to the right two or three points (22½° to 33¾°) to get in line for the Broadway bridge. The tug there kept a little to the left of its tow. When the stern of the Bielman was 50. to 75 feet through the Northwestern bridge and about 150 feet from the Petoskey, which lay at its dock on the northeast side of the river, 200 feet below the Broadway bridge, the tug, with its tow line taut, permitted its tow to sheer to the right four points (45°) and to head directly for the Petoskey. When the tow had sheered to 45°, and the captain saw that he "could not make the bridge any more," he gave a signal to his engineer to put on half power, and, gradually putting his helm over, undertook to right up his tow, but the line broke and the Bielman crashed into the Petoskey.

Admitting his duty to aid in an emergency and that a sheer is an emergency, the captain, with his line all the time taut and a strain upon it, permitted his tow to sheer four points, from two to four times as far as necessary, without making any move whatever. Only after he saw that his tow had gone so far over that he could no longer "make the bridge" did the captain signal his engineer to put the tug under half power and start slowly to work his tow around. Then the line broke.

No reason is given why the tow was permitted to get into a position where it was 20° to 30° off its course in a narrow river. The only reason stated for not giving the signal to his engineer earlier was that it was not necessary. Headed directly onto the Petoskey and moving at 3 or 4 miles per hour, it must have been apparent to an ordinarily careful observer that the Bielman would cover the 150 feet between it and the Petoskey in about 30 seconds. To permit the tow to get into that position showed lack of ordinary and reasonable care on the part of the tug in performing its admitted duty. Under such circumstances, it could make no difference as to libelant's rights whether the line was defective or was broken because the tug jumped on it. The captain of the tug says that, if before the line broke he had given a signal to his tow to back up and it had been acted on there would have been no collision; but he gave no signal, though he says it would have been the duty of the tow to obey one.

The jury verdict was only advisory, and the trial court, not only had the right to disregard it, but was on the record fully warranted in doing so.

The decree is affirmed.